IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELISABETH SWAN AND TRACY O'ROURKE,<br><br>       Plaintiffs,<br><br>   vs.<br><br>KARLO TANJUAKIO, SION LEE, ET AL.,<br><br>       Defendants. | Civ. No. 21-00052 JMS-KJM<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER |

**ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

**I.  INTRODUCTION**

Plaintiffs Elisabeth Swan and Tracy O'Rourke (collectively, "Plaintiffs") have filed a Motion for Issuance of Temporary Restraining Order and Preliminary Injunction" ("Motion for TRO") against Defendant Karlo Tanjuakio. ECF No. 17.  Plaintiffs seek temporary injunctive relief to prevent Tanjuakio from breaching or continuing to breach fiduciary duties owed to Plaintiffs as partners under a partnership agreement, referred to in this Order as the "GoLeanSixSigma.com Partnership" or "GLSS."  Tanjuakio, however, denies the existence of a partnership.  Much of this Motion for TRO thus depends on a

threshold issue of whether GLSS is a partnership with Plaintiffs and Tanjuakio as partners.  (Co-Defendant Sion Lee is also alleged to be a partner, but Lee has not entered an appearance, and the parties appear to agree that he is only a nominal Defendant—at least for present purposes).

Having reviewed the evidentiary record, and considered all briefing and oral argument, the court determines for purposes of this Motion for TRO that GLSS is indeed a partnership.  Tanjuakio owes fiduciary duties to Plaintiffs and the partnership, and he is continuing to breach those duties.  The court thus GRANTS the Motion for TRO and enjoins Tanjuakio from breaching the partnership agreement, with specific injunctive relief set forth in the Conclusion.[1]

## II. <u>BACKGROUND</u>

### A.    **Factual Background**

GLSS is in the business of selling management-related products and services based on "principles of 'lean' and 'six sigma' strategies" or management philosophies.  *See, e.g.*, ECF No. 17-2 at PageID # 86; 21-1 at PageID # 189.  It appears to operate primarily through a website, "GoLeanSixSigma.com."  For purposes of this Motion, the exact nature of the business and its products is not

---

[1] After discussing the Motion for TRO with the parties, the court treats the Motion as seeking only temporary relief, with a separate Motion for Preliminary Injunction to be considered later.

critical.  Rather, the parties appear to agree that the Motion for TRO turns on whether GLSS is a partnership and whether Tanjuakio has concomitant fiduciary duties that come with that status.  This background section thus focuses on describing the dispute regarding GLSS's status (i.e., whether it is a partnership).  It does not, however, set forth all the areas of disagreement regarding the business.  Many of the salient facts are discussed separately in the discussion section that follows.  Ultimately, the Motion turns on determining whether the following document (the "2016 GLSS Partner Agreement") evidences a partnership:

### GoLeanSixSigma.com Partner Agreement

I.  Decision Making Procedures
   A.  Catch-all: When guidelines in this agreement need to be changed, unanimous vote required for approval.
   B.  Majority wins for decisions made outside of this agreement.
   C.  Deadlock: In an effort to maintain a cohesive direction for the organization, Karlo will be deciding factor in deadlock.

II.  Role Guidelines
   A.  Core responsibilities (ensure responsibilities are being met)
     1.  Elisabeth - Primary: Content Development, Secondary: Sales and Media
     2.  Karlo - Primary: Marketing, Sales & Operations
     3.  Sion - Primary: Media & Technology
     4.  Tracy - Primary: Content Development, Secondary: Sales and Media
   B.  SLA
     1.  When activity affects a customer, responses (not necessarily solutions) required within 48 hours
   C.  Partner Meetings: Quarterly - end of each quarter (and as needed)

III.  Product Ownership (GoLeanSixSigma.com and all products offered on the website)
   A.  25% each
     1.  Elisabeth Swan, Swan Consulting
     2.  Karlo Tanjuakio, The Ventus Network
     3.  Sion Lee, Individual
     4.  Tracy O'Rourke, Catalyst Co.

IV.  Accounting Guidelines
   A.  Process: Month-end cycle
     1.  Expenses deducted from revenue
     2.  10% into Reserves - cap of $25k
     3.  Remaining amount split between Partners
   B.  Expenses
     1.  Any expense >$1,000 must be unanimously approved
   C.  Reserves
     1.  Used for advertising, company events, etc. for investment/effort to grow
   D.  Profit Split. Payments will be sent after month-end.
     1.  Elisabeth Swan, Swan Consulting: 25%
     2.  Karlo Tanjuakio, The Ventus Network: 40%
     3.  Tracy O'Rourke, Catalyst Co.: 15%
     4.  Sion Lee, Individual: 20%
   E.  Documentation
     1.  Freshbooks will be used to document income and expenses
     2.  Partners will have access to Freshbooks

V.  Exit Guidelines

3

A. Partner
   1. Must notify all Partners in writing
   2. Must complete any current projects/tasks before leaving
   3. Buyout (% of profit over average of last 3 years)
      a) Payout Term TBD
   4. Clean break
   5. Can act as Reseller
   6. Exit due to incapacity (5%): Upon incapacitation, 2.5% until deceased OR
      if deceased immediately or within 3 years, 2.5% for 3 years to beneficiary
B. Organization (Sale)
   1. Must be unanimously approved
   2. Must unanimously decide on sale price
   3. Split 25% after expenses paid

VI. Non-Compete
A. No partner may develop, consult or influence new or update existing online Lean,
Six Sigma or Lean Six Sigma online training or certification products during and
following two years after individual exit without unanimous approval of Partners.

VII. People First
A. Customers: Helping people improve their skills is why we exist. Purpose: Make it
easy for everyone everywhere to build their problem-solving muscles.
B. Partners: We'll work as a team to help our customers.
C. Transparency & Trust: We'll maintain a high level of trust by encouraging
discussion, transparency and resolutions.

ECF No. 17-6 at PageID ## 109-10.  The document was signed by all parties

(individually), verifying that the terms of the "Partner Agreement are acceptable"

to the "Partners named below."

Acceptance

Partners named below verify that the terms of this Partner Agreement are acceptable and that
terms will be reviewed annually.

| | |
|---|---|
| _Karlo Tanjuakio_ | _Sion Lee_ |
| Karlo Tanjuakio | Sion Lee |
| _Elisabeth C. Swan_ | _Tracy O'Rourke_ |
| Elisabeth Swan | Tracy O'Rourke |

*Id.* at PageID # 111.

      The March 25, 2016 signing date is verified by the following audit

trail:

4

## HELLOSIGN

Audit Trail

| | |
|---|---|
| TITLE | GLSS Partner Agreement - Please Sign |
| FILE NAME | GLSSPartnerAgreementOutline.pdf |
| DOCUMENT ID | 7c9c30a5e767ff35d70bc1b9ba381a7f80a7208f |
| STATUS | ● Completed |

### Document History

| | | |
|---|---|---|
| SIGNED | 03/28/2016 14:55:05 UTC | Signed by Elisabeth Swan (swan.elis@gmail.com) IP: 50.139.160.85 |
| VIEWED | 03/28/2016 16:17:30 UTC | Viewed by Tracy O'Rourke (tracy@goleansixsigma.com) IP: 72.199.22.159 |
| SIGNED | 03/28/2016 16:18:17 UTC | Signed by Tracy O'Rourke (tracy@goleansixsigma.com) IP: 72.199.22.159 |
| COMPLETED | 03/28/2016 16:18:17 UTC | The document has been completed. |

## HELLOSIGN

Audit Trail

| | |
|---|---|
| TITLE | GLSS Partner Agreement - Please Sign |
| FILE NAME | GLSSPartnerAgreementOutline.pdf |
| DOCUMENT ID | 7c9c30a5e767ff35d70bc1b9ba381a7f80a7208f |
| STATUS | ● Completed |

### Document History

| | | |
|---|---|---|
| SENT | 03/25/2016 22:46:22 UTC | Sent for signature to Karlo Tanjuakio (karlo@ventusnetwork.com), Elisabeth Swan (swan.elis@gmail.com), Sion Lee (sionlee@gmail.com) and Tracy O'Rourke (tracy@goleansixsigma.com) IP: 75.85.13.189 |
| VIEWED | 03/25/2016 22:47:06 UTC | Viewed by Karlo Tanjuakio (karlo@ventusnetwork.com) IP: 76.88.147.106 |
| SIGNED | 03/25/2016 22:47:21 UTC | Signed by Karlo Tanjuakio (karlo@ventusnetwork.com) IP: 76.88.147.106 |
| VIEWED | 03/25/2016 22:49:31 UTC | Viewed by Sion Lee (sionlee@gmail.com) IP: 4.35.33.6 |
| SIGNED | 03/25/2016 22:50:34 UTC | Signed by Sion Lee (sionlee@gmail.com) IP: 4.35.33.6 |
| VIEWED | 03/28/2016 14:49:07 UTC | Viewed by Elisabeth Swan (swan.elis@gmail.com) IP: 50.139.160.85 |

*Id.* at PageID ## 112-13.

The evidence indicates that the 2016 GLSS Partner Agreement memorialized a verbal agreement that began around 2013 or 2014, and that the parties had begun discussing as early as 2012. ECF No. 17-2 at PageID # 87; ECF No. 21-2 at PageID # 191-92. The principals were Plaintiffs Swan and O'Rourke, and Defendants Tanjuakio and Lee. ECF No. 17-2 at PageID # 87. At the time of formation, Swan operated "Swan Consulting & Associates, Inc."; O'Rourke operated "Catalyst Consulting"; Tanjuakio operated "The Ventus Network, LLC"; and Lee operated "notalwaysright.com." *Id.* Swan and O'Rourke both attest that "[f]rom 2014-2016 [they] received, on a monthly basis [their] partnership share, which [they] understood to be, collectively, between 40% -50% of the GLSS Partnership's profits." *Id.*; ECF No. 17-3 at PageID # 95. Tanjuakio attests that Swan and O'Rourke were paid as "independent contractors" via IRS Forms 1099, ECF No. 21-2 at PageID # 195. The record reflects, for example, that in 2014, The Ventus Network, LLC distributed $44,207.89 to O'Rourke on a form 1099-MISC. ECF No. 21-14 at PageID # 317.

Swan and O'Rourke both attest that the written 2016 GLSS Partner Agreement was "consistent with our prior verbal partnership agreements." ECF No. 17-2 at PageID # 87; ECF No. 17-3 at PageID # 96. For his part, Tanjuakio declares that "[i]n or around 2016, I, Lee, Swan, and O'Rourke mutually created an

outline agreement to address which individual/entities owned what share of GLSS co-developed products and how profit shares from those GLSS co-developed products would be paid." ECF No. 21-2 at PageID # 195.

The original profit-splits in the 2016 GLSS Partner Agreement were as follows: "Elisabeth Swan, Swan Consulting: 25%"; "Karlo Tanjuakio, The Ventus Network: 40%"; "Tracy O'Rourke, Catalyst Co.: 15%"; and "Sion Lee, Individual: 20%." ECF No. 17-6 at PageID # 109; ECF No. 21-2 at PageID # 196. The profit-splits were modified later in 2016, and again in 2019 and 2020. ECF No. 21-2 at PageID # 196. Under the 2016 GLSS Partner Agreement, Swan received (via Forms 1099) "$207,267.78 in 2016; $241,798.60 in 2017; $410,174.53 in 2018; $441,892.49 in 2019; and $234,929.92 in 2020." *Id.* Likewise, under the 2016 GLSS Partner Agreement, O'Rourke received (also via Forms 1099) "$156,943.00 in 2016; $188,128.94 in 2017; $338,517.45 in 2018; $403,747.24 in 2019; and $235,454.69 in 2020." *Id.* at PageID ## 196-97. *See also* ECF No. 21-18 (Income Statement for GLSS).

Plaintiffs began to have disagreements with Tanjuakio about GLSS in the Summer of 2020. ECF No. 17-3 at PageID # 97. In July 2020, for example, Tanjuakio sent an email summarizing proposed restructuring of GLSS operations. ECF No. 17-7. He proposed new terms for profit payouts to Plaintiffs, stating that

"[i]f the restructuring doesn't work for you, we'll need to dissolve the existing *partnership agreement* based on the exit guidelines." *Id.* at PageID # 115 (emphasis added). During September 2020, the parties exchanged a "Content Provider Agreement," ECF No. 21-19 at PageID ## 355-66, and a "Partnership Amendment Agreement," ECF No. 17-8 at PageID ## 120-23, with differing terms of a revised agreement.

On October 3, 2020, Tanjuakio sent Plaintiffs an email after the parties reached a deadlock in negotiations. ECF No. 17-9 at PageID # 125. In the email, Tanjuakio tells Plaintiffs, "You are not a partner of the business. You will get a royalty for the products you developed." *Id.* He stated:

> As the owner of the business that is selling these products, I've made the decision to continue to operate in accordance with the current agreement with which I'll be paying you each 15% of the profit earned on the products you have helped develop, while relieving you of all of the responsibilities we discussed related to marketing and product support, to help you focus on growing your independent consulting work. You'll each be earning royalties while doing no work for GLSS.

*Id.* He continued:

> I've adjusted all of our processes to alleviate you of all work. This means that access to GLSS will be limited to the same extent that other consultants have. You'll no longer be attending any standard recurring meetings. You may still participate where necessary as consultants. As stated above you will be earning royalties on sales of

8

the products you helped developed (*sic*).  These changes
take effect immediately.

*Id.*

Since that time, Plaintiffs allege that Tanjuakio has cut off access to

GLSS business activities, the GLSS partnership, and all related involvement,

including email access.  ECF No. 17-2 at PageID # 89.  He has made other changes

to the GLSS website, including changes to content and products in which Plaintiffs

claim to have ownership interests.  *Id.* at PageID ## 90-91.  And Plaintiffs have not

received any payments from GLSS activities since December 2020.  *Id.* at PageID

# 91; ECF No. 17-3 at PageID # 99.

For his part, Tanjuakio contends that Plaintiffs are now operating a

website or domain, jitcafe.com, utilizing content that previously was available on

the GLSS website.  ECF No. 21-2 at PageID # 200.  He argues that this usage is in

competition with GLSS and justified "temporarily removing [Plaintiffs'] access to

GLSS' Google accounts in or around December 2020."  *Id.* at PageID # 202-03.

Similarly, he claims that this is the reason that "neither [he] nor Venus LLC have

paid either Swan or O'Rourke anything under the 2016 Agreement since their last

payment in November 2020."  *Id.* at PageID # 203.

**B.     Procedural History**

Plaintiffs filed suit on January 21, 2021.  ECF No. 1.  The Complaint asserts claims for "Breach of Contract — GLSS Partner Agreement" against Tanjuakio; "Breach of Fiduciary Duty; Violation of [Hawaii Revised Statutes ("HRS")] § 425-123" against Tanjuakio; "Request for Records; Violation of HRS § 425-122" against Tanjuakio; and "Dissolution" against Tanjuakio and Lee.  *Id.* at PageID ## 14-19.

On March 15, 2021, the parties stipulated to stay the action pending completion of an early settlement conference.  ECF No. 11.  They agreed to extend the time for Tanjuakio to answer or otherwise respond to the Complaint, and sought an early settlement conference with Magistrate Judge Kenneth Mansfield.  *Id.* at PageID # 40.  Thereafter, Judge Mansfield held a settlement conference on April 1, 2021, ECF No. 15, but the action did not settle.  On April 19, 2021, the parties stipulated to lift the stay of the action.  ECF No. 16.

Two days later, on April 21, 2021, Plaintiffs filed their Motion for TRO.  ECF No. 17.  The court held status conferences regarding the Motion on April 22 and 23, 2021.  ECF Nos. 19, 20.  Tanjaukio filed his Opposition on April 28, 2021, ECF No. 21, and Plaintiffs filed their Reply on April 30, 2021, ECF No. 22.  The court held a hearing via video conference on May 4, 2021.  ECF No. 23.

### III.  <u>STANDARD OF REVIEW</u>

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002) (citation omitted); *cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (observing that an analysis of a preliminary injunction is "substantially identical" to an analysis of a temporary restraining order).

A preliminary injunction is an "'extraordinary and drastic remedy' . . . never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted).  "To warrant a preliminary injunction, [Plaintiffs] must demonstrate that [they meet] all four of the elements of the preliminary injunction test established in [*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)]." *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).  To meet the *Winter* elements, "a plaintiff must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *BOKF, NA v. Estes*, 923 F.3d 558, 561-62 (9th Cir. 2019) (citation and quotation marks omitted).  "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than

likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Preliminary injunctive relief should always be denied, however, if the probability of success on the merits is low.  *See Johnson v. Cal. State Bd. of Acct.*, 72 F.3d 1427, 1430 (9th Cir. 1995) (stating that "even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits") (citation omitted).

## IV.  ANALYSIS

Plaintiffs have met their burden as to all four *Winter* elements, and the court addresses each in turn.

### A.    Likelihood of Success

For purposes of this Motion, Plaintiffs have established that they are highly likely to succeed in proving that the 2016 GLSS Partner Agreement is a valid partnership agreement between Plaintiffs and Tanjuakio (and Lee), providing for equal "product ownership" in "GoLeanSixSigma.com and all products offered on the website."  *See* ECF No. 17-6 at PageID # 109 (listing "25% each" product

ownership among Swan, Tanjuakio, Lee, and O'Rourke).[2]  Even if some of the

terms in the written agreement are ambiguous, the evidence is clear that all parties

intended the 2016 Partner Agreement to memorialize a partnership agreement that

had been in existence earlier—at least since 2014, and possibly as early as some

time in 2012.  *See, e.g.*, ECF No. 17-3 at PageID # 95.  At minimum, the 2016

GLSS Partner Agreement by itself sets forth enforceable terms of a partnership,

even without regard to a prior verbal agreement.

      "Under Hawaii law, 'the association of two or more persons to carry

on as co-owners a business for profit forms a partnership, whether or not the

persons intend to form a partnership.'"  *Mroz v. Hoaloha Na Eha, Inc.*, 410 F.

Supp. 2d 919, 932 (D. Haw. 2005) (quoting HRS § 425-109).  "The term

'partnership agreement' is defined as 'the agreement, whether written, oral, or

implied, among the partners concerning the partnership. . . .'"  *Id.* (quoting HRS

§ 425-101).  "'There are no specific indices of partnership, although an agreement

to share in the profits and losses of a business is weighty evidence thereof.'"

---

[2] Although the 2016 GLSS Partner Agreement lists the partners' affiliations (i.e., "Elisabeth Swan, Swan Consulting"; "Karlo Tanjuakio, The Ventus Network"; "Sion Lee, Individual"; "Tracy O'Rourke, Catalyst Co."), this listing is not significant, at least for purposes of this TRO.  The Complaint and relevant declarations explain the nature and citizenship of the business entities (*see* ECF No. 1 at PageID # 4, ECF No. 17-3 at PageID # 95), and nothing in this TRO turns on any distinction between the individuals and their corresponding business entities.  For example, even if the alleged breaches were technically committed by "The Ventus Network" rather than by Tanjuakio as an individual, there is still a likelihood of success, a likelihood of irreparable harm, and a showing of the other *Winter* factors.

*Id.* (quoting *Buffandeau v. Shin*, 60 Haw. 280, 281, 587 P.2d 1236, 1237 (1978)). "Under Hawaii law, a partnership may be found even in the absence of a formal contract between the parties." *Id.* (citing *Great Hawaiian Fin. Corp. v. Aiu*, 863 F.2d 617, 620 (9th Cir. 1988)). "In order to constitute a partnership, there need be no partnership name nor any stipulation that there is a partnership." *Id.* (quoting *Matter of O.W. Ltd. P'ship,* 4 Haw. App. 487, 494, 668 P.2d 56, 62 (1983)).[3]

Although Tanjuakio attests that he never intended to create a "legally distinct separate entity" or "a general or other legal form of partnership," ECF No. 21-2 at PageID # 192, he admits that at numerous times during GLSS's formation and operation (1) he "use[d] the term partnership"; (2) he "suggested 'partnering on a project'"; and (3) the terms "partner" and "partnership" appear on the GLSS website "in terms of how the business wants to relate to its actual and prospective customers and clients." *Id.* And the operations of the entity accord with partnership principles. The evidence thus clearly establishes that there was an "association of two or more persons to carry on as co-owners a business for profit."

---

[3] The 2016 GLSS Partner Agreement does not have a choice of law clause. For present purposes, the court applies substantive Hawaii law in this diversity action. *See Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011); *Allstate Ins. Co. v. Riihimaki*, 2012 WL 1983321, at *6 (D. Haw. May 30, 2012). Moreover, "the law of the jurisdiction in which a partnership has its chief executive office governs relations among the partners[.] HRS § 425-106(a). And Hawaii's partnership law is based on blackletter principles stemming from the Uniform Partnership Act. *See* Act 284, Haw. Sess. L. 886 (July 6, 1999); *see also* HRS 425-198 ("This chapter may be cited as the Uniform Partnership Act [(1997]").

*Mroz*, 410 F. Supp. 2d at 932.  This is so "whether or not [Tanjuakio] intend[ed] to form a partnership," *id.*, and regardless of whether Plaintiffs were paid with IRS Forms 1099.

Similarly, Tanjuakio describes discussions before March 2016 as being about "creating a separate entity of some kind in connection with GLSS," but the parties "decided not to create any *new* entity[.]"  ECF No. 21-2 at PageID # 193 (emphasis added).  But even if the parties could not agree on forming a "new entity" after 2016, this does not mean that the *existing* entity was not a partnership.  Indeed, Tanjuakio describes the existing entity as "a profit sharing/product ownership model limited to the training products that were co-developed," *id.*, which is just as consistent with being a partnership as another form of entity, especially where there is no evidence that the GLSS entity itself took a different form (e.g., a corporation or limited liability company).  Even if Tanjuakio was using Ventus LLC for administrative purposes, *id.* at PageID # 194, the evidence clearly indicates that GLSS is a partnership.

And perhaps most important, the 2016 GLSS Partner Agreement on its face certainly describes a partnership, both in its title ("Partner Agreement") and in its particular terms (again, even if some of them are ambiguous).  *See* ECF No. 17-6 at PageID # 109 (providing for quarterly "Partner Meetings" and that

"Partners will have access to Freshbooks"); *id.* at PageID # 109-110 (setting forth

terms for "Exit Guidelines" for "Partner[s]" including "[m]ust notify all Partners in

writing"); *id.* at PageID # 110 ("No partner may develop, consult or influence new

or update existing . . . products during and following two years after individual

exist without unanimous approval of Partners."). The agreement was signed by the

parties, acknowledging that "Partners named below verify that the terms of this

Partner Agreement are acceptable[.]" *Id.* at PageID # 111. The 2016 GLSS

Partner Agreement contains terms regarding profit sharing, decision-making,

product ownership, accounting, exiting, and non-competition. ECF No. 17-6 at

PageID # 109-10. In short, it establishes a partnership.[4]

Next, given the extremely high likelihood that GLSS is in fact a

partnership, it is blackletter law in Hawaii (and elsewhere under the Uniform

Partnership Act) that partners (Tanjuakio included) owe fiduciary duties of loyalty

and care to the partnership and other partners. *See* HRS § 425-123(a). These

statutory duties of loyalty include an obligation "[t]o account to the partnership and

---

[4] The court attributes no significance to a factual dispute about which party—O'Rourke or Tanjuakio—first proposed a written "Partnership Amendment Agreement." *See* ECF No. 17-8. In her initial declaration of April 20, 2021, O'Rourke asserted that Tanjuakio sent her the draft, ECF No. 17-3 ¶ 27, while Tanjuakio contends that O'Rourke sent it to him first, ECF No. 21-2 at PageID # 205. O'Rourke's April 30, 2021 Declaration clarifies that she was actually referring to a draft "Content Provider Agreement," first proposed by Tanjuakio. ECF No. 22-1 at PageID # 435. This dispute simply makes no difference to the court's finding that there is a partnership.

hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property," HRS § 425-123(b)(1), and "[t]o refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership," HRS § 425-123(b)(3).  The duty of care requires partners to "discharge the duties to the partnership and the other partners . . . and exercise any rights consistently with the obligation of good faith and fair dealing."  HRS § 425-123(d).  *See also TSA Int'l Ltd. v. Shimizu Corp.*, 92 Haw. 243, 257, 990 P.2d 713, 727 (1999) ("Generally, the fiduciary relationship among partners imposes on them obligations of utmost good faith and integrity in their dealings with one another in partnership affairs.") (citations omitted).

It appears equally clear that Tanjuakio has breached fiduciary duties. In October 2020, he unilaterally decreed that Plaintiffs were not "partner[s] in the business."  ECF No. 17-9 at PageID # 125.  He unilaterally (and contrary to terms of the 2016 Partner Agreement) "reliev[ed] [Plaintiffs] of all of the responsibilities we discussed related to marketing and product support[.]"  *Id.*  He "adjusted all of [GLSS's] processes to alleviate [Plaintiffs] of all work," meaning that "access to GLSS will be limited to the same extent that other consultants have," such that Plaintiffs will "no longer be attending any standard recurring meetings."  *Id.*  And

he decreed that "[t]hese changes take effect immediately [on October 3, 2020]."
*Id.* Tanjuakio admits that he has cut off Plaintiffs' access to the business and that
"neither [he] nor Ventus LLC have paid either Swan or O'Rourke anything under
the 2016 Agreement since . . . November 2020." ECF No. 21-2 at PageID # 203.

There is also evidence that Tanjuakio has been changing GLSS
content and has been telling customers that Plaintiffs are "no longer with GLSS."
ECF Nos. 17-4 at PageID ## 103-04; 17-2 at PageID ## 89-90; 17-3 at PageID
## 98-100. And Tanjuakio admits that he plans to "transition Ventus LLC away
from the GLSS business," and "launch a new, completely separate business." ECF
No. 21-2 at PageID # 207. He attests that he has "so far held off on exercising my
contractual rights under Paragraph V(A) [the exit provision] of the 2016 [Partner]
Agreement, despite my previously communicating to [Plaintiffs] through my
attorney that I intended to do so." *Id.* Although it is unclear what the precise
scope of Tanjuakio's new business will be, it appears clear that he intends
(unilaterally) to end the GLSS business, at least in its current form—meaning the
loss of an ongoing business is at stake. It also appears clear that he plans to take

existing GLSS clients to this new business even if for "new" products. *Id.* at PageID ## 207-08.[5]

In short, the evidence establishes that it is highly likely that GLSS is a partnership (with concomitant fiduciary duties among partners), and that Tanjaukio has breached (and is breaching) those fiduciary duties.

## B.    Irreparable Harm

Given the likelihood of Tanjuakio's breaches, it is also apparent that Plaintiffs will suffer irreparable harm if some sort of injunction is not issued immediately.  True, monetary relief is available if damages are proven, and "monetary injury is not normally considered irreparable." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). "Nonetheless, 'the threat of being driven out of business is sufficient to establish irreparable harm.'" *HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) (brackets omitted)).  "[T]he loss of an ongoing business

---

[5] The court is not convinced by Tanjuakio's argument that he is entitled to ignore the partnership agreement because Plaintiffs were first to breach.  *See* ECF No. 21 at PageID ## 179-80 (citing *Gramercy Grp., Inc. v. D.A. Builders, LLC*, 2018 WL 1245480, at *5 (D. Haw. Mar. 9, 2018)).  The evidence appears to establish the contrary—that is, that Plaintiffs use of the "Just-in-Time Cafe" podcast and "@jitcafe.com" came *after* Tanjuakio's breaches, and with his consent.  ECF No. 22-1 at PageID ## 434-36.  That is, Tanjuakio has not established at this stage that prior material breaches prevent claims for breaches against him.  Given the weight of the evidence, any factual dispute in this regard does not diminish the force of the evidence that Tanjuakio was (and is) breaching fiduciary duties owed to his partners.

representing many years of effort and the livelihood of its owners [] constitutes irreparable harm." *Id.* (quoting *Roso-Lino Beverage Distrib., Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125-26 (2d Cir. 1984)) (internal editorial marks omitted). "Thus, showing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *Id.* (citing *Am. Passage Media Corp.*, 750 F.2d at 1474). And given the strong indication that "the loss of . . . an ongoing business representing many years of effort," *Roso-Lino*, 749 F.2d at 125-26, is at stake, Plaintiffs have sufficiently met the irreparable harm prong of *Winter*.

The court rejects Tanjuakio's argument that Plaintiffs' delay in seeking a TRO is indicative of a lack of irreparable harm. *See* ECF No. 21 at PageID # 182 (citing *Yu v. Queen's Med. Ctr.*, 2020 WL 355205, at *7 (D. Haw. Jan. 21, 2020) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.") (citation omitted)). Quite the contrary. Plaintiffs filed this action on January 21, 2021, which was shortly after events had escalated and after their GLSS email access was cut-off. ECF No. 22-1 at PageID # 436. They then sought to resolve the dispute through negotiations, and the parties jointly stayed matters while seeking a court-sanctioned settlement conference. ECF No. 11. After those negotiations were unsuccessful, Plaintiffs

filed their Motion for TRO only two days after the stay was lifted by the

Magistrate Judge.  *See* ECF Nos. 16, 17.  These events do not signal an improper

delay or a lack of irreparable harm.

## C.   Balance of Equities and Public Interest

For the same reasons, the court concludes that the balance of equities

favor granting the Motion, and that doing so is in the public interest.  The court

simply requires Tanjuakio to comply with his obligations as a partner, and requires

him to cease actions to the contrary, i.e., he must comply with the law and the

partnership agreement's terms.

The court rejects Tanjuakio's argument that allowing Plaintiffs access

to information related to GLSS's business will damage Tanjuakio or Ventus LLC's

confidential business plans or information.  He claims to be concerned that "any

access [to the GLSS business, as well as to Ventus LLC's business as a whole]

gives Swan and O'Rourke further opportunities to take GLSS products and

intellectual property, confidential business strategy, and other sensitive information

without authorization and use it in a competing business that violates the 2016

Agreement[.]"  ECF No. 21-2 at PageID # 206.  But, as Plaintiffs point out, this

argument is inconsistent with Tanjuakio's claim that he plans in July 2021 "to

launch a new, completely separate business . . . in connection with a fundamentally

different industry than Lean Six Sigma." *Id.* at PageID # 207.  If Tanjuakio's, or Ventus LLC's, new business is completely separate and in a fundamentally different industry than GLSS, then there is no risk of harm to him to allow Plaintiffs access to information (to which they are otherwise entitled as partners). That is, if Tanjuakio exits the partnership and the industry altogether as he attests, there is no risk that Plaintiffs will gain a competitive advantage with GLSS information.  In any event, they are entitled to assert their rights as partners.

Finally, the public interest supports enforcing compliance with the law—here, compliance with fiduciary duties required of all partners.  *See, e.g.*, *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) ("[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer."); *A Place for Mom v. Perkins*, 475 F. Supp. 3d 1217, 1232 (W.D. Wash. 2020) ("On balance, the public interest is benefitted through the enforcement of contractual provisions that aim to protect a company's investment in its development of trade secrets and customer relationships.") (citation omitted); *see also WHIC LLC v. NextGen Labs., Inc.*, 341 F. Supp. 3d 1147, 1166 (D. Haw. 2018).

"'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary

remedy of injunction.'" *NextGen Labs.*, 341 F. Supp. 3d at 1166 (quoting *Winter*, 555 U.S. at 24).  "'The public interest inquiry primarily addresses [the] impact on non-parties rather than parties.'"  *Id.* (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. at 22).  Thus, considering the interests of the public and current users of GLSS in avoiding confusion with the ongoing GLSS business, *see, e.g.*, ECF No. 17-4 at PageID ## 103-04, this prong of the *Winter* test is also satisfied.

## D.   Security Under Federal Rule of Civil Procedure 65(c)

Federal Rule of Civil Procedure 65(c) provides in part that "[t]he court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  This condition is often fulfilled by posting of a bond.  But "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*.'" *Taylor-Failor v. Cnty. of Hawaii*, 90 F. Supp. 3d 1095, 1102 (D. Haw. 2015) (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003)).  "A district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining its conduct."  *Id.*  And "[t]he likelihood of a plaintiff's success on the merits 'tips in favor of a minimal bond or

23

no bond at all.'" *Shuting Kang v. Harrison*, 2019 WL 4645723, at *2 (N.D. Cal. Aug. 13, 2019) (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985)).

Exercising its discretion, the court will not require Plaintiffs to post a bond. The court finds a very high likelihood that they will succeed on the merits, especially as to the threshold issue of whether GLSS is a partnership. This high likelihood "tips in favor of . . . no bond at all." *Id.* Moreover, there is "no realistic likelihood of harm," *Cassiday*, 320 F.3d at 919, from requiring Tanjuakio to comply with duties required of him as a partner. The court is simply requiring him to follow the law.[6] No bond is required.

## V. <u>CONCLUSION</u>

All four elements of *Winter* are satisfied. GLSS is a partnership. Tanjuakio must treat it as such. He must comply with fiduciary duties. Accordingly, the court enters a temporary restraining order as follows, the language of which is based on a post-TRO hearing agreement between Plaintiffs and Tanjuakio. *See* ECF No. 24.

---

[6] For that reason—requiring Tanjuakio to follow the law—an injunction requiring Tanjuakio to revert to the "status quo" as of October 2020 would not implicate "mandatory injunction" standards.

1. While under this temporary restraining order, Defendant Tanjuakio, or anyone acting on his behalf, shall not:

   a. Exit the parties' GoLeanSixSigma.com Partner Agreement ("Agreement") without Court oversight;

   b. Sell or transfer operations and/or assets of the GoLeanSixSigma.com business, other than in the in the ordinary course of the business, without Plaintiffs' consent or Court approval;

   c. Shut down the GoLeanSixSigma.com website or use it to redirect any client of the GoLeanSixSigma.com business to any other website or business; or

   d. Market or direct any client or potential client of the GoLeanSixSigma.com business to any product or service that would compete with the GoLeanSixSigma.com business.

2. While under this temporary restraining order, Defendant Tanjuakio, or those acting on his behalf, shall:

   a. Restore, and not remove or restrict, Plaintiffs' prior level of access to financial information of the GoLeanSixSigma.com business via the Google Drive document used by the parties;

   b. Restore, and not remove or restrict, Plaintiffs' prior level of access to the following accounts used in the GoLeanSixSigma.com business: Google, Asana, Litmos, Pipedrive, and Zoom; and

   c. Restore, and not remove or restrict, Plaintiffs' access to their GoLeanSixSigma email accounts.

   Further, the parties have agreed that this Temporary Restraining Order

shall remain in effect until Plaintiffs' request for a preliminary injunction is heard

and ruled on by the Court.  By separate notice, a hearing on a motion for preliminary injunction will be set for the first available date on the court's calendar, approximately 30 days from the entry of this Order (but not on June 3, 7, or 8, 2021, as requested by counsel, ECF No. 24 at PageID # 443).  That is, the parties consent under Federal Rule of Civil Procedure 65(b)(2) to an extension of the 14-day period for expiration of the Temporary Restraining Order.

 IT IS SO ORDERED:

 DATED:  Honolulu, Hawaii, May 5, 2021.



     /s/ J. Michael Seabright
     J. Michael Seabright
     Chief United States District Judge

*Swan v. Tanjuakio*, Civ. No. 21-00052 JMS-KJM, Order Granting Motion for Temporary Restraining Order